Filed 6/9/26  P. v. Romero CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ELOY ROMERO, JR.,<br><br>Defendant and Appellant. | F089503<br><br>(Super. Ct. No. F14905684)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  F. Brian Alvarez, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Caitlin Franzen, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

At a resentencing hearing required by Penal Code section 1172.75,[1] the trial court declined to exercise its discretion under section 1385 or *Tirado*[2] to strike or reduce the two 25-year-to-life firearm enhancements imposed on defendant Eloy Romero, Jr., and he appeals. As explained herein, the People's argument that the trial court lacked jurisdiction to resentence defendant under section 1172.75, subdivision (f), is foreclosed under this court's recent decision in *People v. Robinson* (2026) 120 Cal.App.5th 516, 528–529 [2026 Cal.App. Lexis 288, *18–20] (*Robinson*), and we conclude that defendant forfeited his claim of sentencing error under section 1385, as he neither argued the issue nor objected to the trial court's exercise of its sentencing discretion on the ground he now advances on appeal (*People v. Fruits* (2016) 247 Cal.App.4th 188, 208 (*Fruits*)).[3]

Accordingly, we affirm the judgment. However, we shall direct the trial court to correct a clerical error in the sentencing minute order and abstract of judgment.

## BACKGROUND

In an amended information filed November 9, 2015, the Fresno County District Attorney charged defendant with two counts of murder with multiple-murder special circumstance allegations. (§§ 187, subd. (a), 190.2, subd (a)(3).) As to each count, the information alleged defendant personally used a firearm (§ 12022.5, subd. (a)), and personally and intentionally discharged a firearm proximately causing death (§ 12022.53, subd. (d)). The information also alleged two prior prison term enhancements under section 667.5, former subdivision (b).

---

[1] Subsequent statutory references are to the Penal Code unless otherwise noted.

[2] *People v. Tirado* (2022) 12 Cal.5th 688, 700 and footnote 12 (*Tirado*) (holding that trial courts have the discretion to substitute a lesser enhancement under § 12022.53 under certain circumstances).

[3] Defendant does not claim error under *Tirado*.

A jury convicted defendant of both counts of special-circumstance murder and found the firearm enhancements true. Defendant admitted the prior prison term allegations under section 667.5, former subdivision (b).

On count 1, the court sentenced defendant to life without the possibility of parole (LWOP), with a consecutive term of 25 years to life (§ 12022.53, subd. (d)); a stayed, consecutive term of four years (§ 12022.5, subd. (a));[4] and one year for each of the two prior prison term enhancements (§ 667.5, former subd. (b)). On count 2, the court sentenced defendant to LWOP, with a consecutive term of 25 years to life (§ 12022.53, subd. (d)), and a stayed term of four years (§ 12022.5, subd. (a)).

Defendant appealed and, in 2018, this court modified the judgment to delete the parole revocation restitution fine under section 1202.45 and directed the trial court to correct the abstract of judgment but otherwise affirmed the judgment. (*People v. Romero* (May 23, 2018, F073111) [nonpub. opn.] (*Romero I*).)

"'Effective January 1, 2020, Senate Bill No. 136 (2019–2020 Reg. Sess.) (Stats. 2019, ch. 590) … amended section 667.5 by limiting the prior prison term enhancement to only prior terms for sexually violent offenses. [Citations.] Enhancements based on prior prison terms served for other offenses became legally invalid.'" (*People v. Escobedo* (2023) 95 Cal.App.5th 440, 445.) "'Later, in 2021, the Legislature enacted Senate Bill No. 483 (2021–2022 Reg. Sess.) .… This bill sought to make the changes implemented by [Senate Bill No.] 136 retroactive.… It took effect on January 1, 2022, and added former section 1171.1, now section 1172.75, to the Penal Code. (Stats. 2021, ch. 728, § 3; Stats. 2022, ch. 58, § 12.)'" (*Ibid.*) Section 1172.75 charges the Secretary of the Department of Corrections with identifying prisoners serving time under judgments that included the now-invalid enhancements, and notifying the court that

---

[4] The minute order incorrectly cited subdivision (b) of section 12022.5 for the enhancements to counts 1 and 2.

pronounced judgment. (*Id.*, subd. (b).) The statute requires the sentencing court to review such judgments and, if it includes a now-invalid enhancement, to recall the sentence and resentence the defendant. (*Id.*, subd. (c).)

Pursuant to this statutory scheme, a hearing was set in the present matter on July 31, 2023, and the court appointed the public defender to represent defendant. On March 13, 2025, the court resentenced defendant to the same sentence as before, except that it struck the two enhancements under section 667.5, former subdivision (b). Defendant appeals.

## FACTS[5]

### *The Homicides and Surrounding Events*

In May 2014,[6] Joseph Blunt was in a dating relationship with defendant's aunt. Blunt, who lived in Santa Clara, came to Clovis to visit defendant's aunt on Mother's Day weekend. He spent the weekend at her house, or in the company of his children and nephew. Defendant's aunt last saw Blunt around 11:00 a.m. on Sunday, and last had telephonic contact with him around 8:00 p.m. She called him around 10:00 p.m. and again at 11:00 p.m., but he did not answer either time. Blunt did not indicate he was meeting up with defendant, whose nickname was Goober, or with George Duarte, whose nickname was Cuco.

A.D. last saw Duarte, his son, around 10:15 or 10:20 p.m. on Sunday, May 11. They were at the family residence on Buttonwillow, south of Jefferson, near Reedley. Duarte was talking to Blunt, who had just arrived, alone, in his car. Duarte and Blunt both seemed to be in good moods. They left the house around 10:30 or 10:45 p.m.

---

[5] The facts section of this opinion is taken directly from *Romero I, supra*, F073111, with footnotes removed.

[6] All further dates are to the year 2014 unless otherwise noted.

Duarte told his mother that he and Blunt were leaving, and that he would be right back. A.D. went to sleep.

At some point on May 11, Blunt telephoned one of his adult nephews. Blunt said he was planning on moving out-of-state within the month and wanted to say goodbye. He and Duarte, Blunt's best friend, arrived that evening in Blunt's car, an hour to an hour and a half after Blunt had called. They met at the liquor store across the street from the nephew's home in Parlier. This was around 11:00 p.m. or 11:15 p.m. Blunt and his nephew talked, then Blunt and Duarte left around 11:35 p.m. Blunt said they were going back to Duarte's house in Reedley, which was about a six-minute drive away. Blunt said nothing about defendant.

R.M. had known defendant most of his life, and had once been involved in a gang with him. He personally knew Duarte, and had heard of Blunt, although he did not know him personally. Around 11:00 p.m. on May 11, or midnight of May 12, R.M. spoke with defendant by phone. Defendant said he was waiting to meet up with Blunt. Defendant did not say where or why, although he said it was Blunt who wanted the meeting. A week or so earlier, defendant showed R.M. a revolver he had. It was chrome with a black grip. Defendant had it with him everywhere he went.

Throughout much of the evening of May 11, defendant's sister-in-law had a conversation with defendant, by text message, about him wanting to pick up one of his children at his wife's house. At 12:01 a.m. on May 12, defendant asked his sister-in-law to tell his wife that he loved her. That was the last contact the sister-in-law received from defendant from the phone number she associated with him.

Shortly after midnight on May 12, Duarte's nephew, who lived at the family residence on Buttonwillow, was in his bedroom when he heard three popping noises and a big crash. The popping sounded like gunshots or firecrackers.

5.

Around 5:30 or 5:40 a.m. on May 12, an individual driving down Buttonwillow on his way to work noticed an overturned car in an orchard on the side of the road, a short distance from the Duarte residence. He called 911.

California Highway Patrol (CHP) Officer Munoz arrived within minutes. Munoz found Blunt in the driver's seat and Duarte in the right front passenger seat. Paramedics arrived a short time later and determined both men were dead. Munoz did not observe any signs of a shooting. The front seatbelts both had blood on them, indicating they were being used during the collision. The right and left rear seatbelts, which were lap and shoulder combinations, were retracted back. Munoz was able to conclude they were not in use at the time of the collision. The middle rear seatbelt, which was just a lap belt, was lying on the seat with the buckle extended all the way to the end of the seatbelt. Munoz could not tell whether it had been in use.

Fresno County Deputy Coroner Andrews arrived on scene just before 8:00 a.m. She located a T–Mobile cellular phone on the headliner of the overturned vehicle. Duarte had a Samsung/AT & T cellular phone in a case on his belt. This caused Andrews to believe the phone that was loose in the vehicle belonged to Blunt. She took possession of both phones. She did not see any other telephones in the vehicle.

Later that morning, Dr. Gopal was performing an autopsy on Blunt, when he discovered Blunt had a bullet wound to the head. He stopped the autopsy, and the sheriff's office was contacted.

Initially, the crash location was processed, and the incident investigated, as a motor vehicle accident. After Gopal's discovery, however, the car, which was being held at a tow yard, was processed. A Nokia cellular phone was seized from the driver's seat. Subsequent DNA analysis showed blood samples collected from various locations inside the vehicle came from Blunt and Duarte, and, in some instances, a mixture of three or more persons who could not be identified because the mixture was too complex. The area around the crash site was searched, including with a metal detector. No shell

6.

casings, bullets, or gun-related evidence was found. Likewise, no such evidence was found in the car.

Gopal resumed the autopsy on Blunt once sheriff's personnel arrived. Blunt had a gunshot entrance wound above and slightly behind the right ear. The adjacent intact skin had some powder tattooing, but the hair was not singed or burned, indicating an intermediate range shot fired from approximately six inches to 24–30 inches away. Copper jacket fragments were recovered from the track of the bullet, while a large fragment of the lead bullet itself was lodged in the sphenoid bone. The direction of the gunshot wound was above downward, and slightly back to front. Blunt also had a second gunshot entrance wound below and behind the right ear. The bullet fragmented and lodged in the left side of the brain. There was powder tattooing around the entrance wound, but no soot deposits or singeing or burning of the hair, again meaning it was an intermediate range shot. Copper jacket fragments, fragments of lead, and the base of a medium caliber bullet were found along the wound track. There were no exit wounds or other obvious injuries to Blunt's body. Gopal opined that the cause of death was perforation of the brain due to multiple gunshot wounds. The manner of death was homicide. Blunt could have lived for several minutes after being shot, but he may have been immediately incapacitated.

Gopal also conducted an autopsy on Duarte, and again found two gunshot entrance wounds. The first was above and slightly behind the left ear. It was an intermediate range shot, although possibly from slightly closer than the shots to Blunt, since the powder tattooing was a little more dense in Duarte's case. The wound path was from above downward and very slightly back to front. Gopal recovered a medium caliber, copper jacketed lead bullet. The second gunshot entrance wound was an intermediate shot to the left temporal region, in front of the left ear. The wound path was left to right. Recovered from the wound track was a piece of copper jacket, a fragment of lead bullet, and the lead core of the bullet. There were no exit wounds, but there were abrasions to

7.

the neck and jaw that could be consistent with being involved in a traffic collision. Gopal opined that the cause of death was perforation of the brain due to multiple gunshot wounds to the head. The manner of death was homicide.

Robert Benavidez, a criminalist in the Fresno County Sheriff's Office forensic laboratory, examined the bullet, bullet fragments, and bullet jacket fragments found during the autopsies. They fell within the nominal .38-caliber class, which would include a .357 magnum and a nine-millimeter. All four bullets were fired from the same gun. The absence of shell casings at the crime scene suggested the gun used was a revolver and so did not eject cartridge casings, or the shooter picked up the casings.

On the morning of Tuesday, May 13, defendant showed up at his mother-in-law's house in Fresno. He was acting "[a] little nervous." He said an accident had happened. He said he did something stupid, was in trouble, and was leaving and going to Las Vegas. He asked his mother-in-law to tell his wife that he loved her and his children. He asked to use his mother-in-law's cellular phone, because, he said, he had thrown his phone away. She did not notice any kind of injuries on his face or body. He later contacted her from a phone with a different area code than the number she associated with him.

Two or three days after the shooting, defendant called R.M. from a number R.M. had not seen before. When R.M. asked what happened that night with Blunt, defendant hung up on him. R.M. tried to call him back, but there was no answer. Defendant called back the next day. They did not talk about the shooting.

Around midnight on May 29, defendant came to his mother-in-law's house and dropped his children off with her. She told him the police were looking for him. He said he did not do anything. She responded that if he did not do anything, to go talk to the police. He said he did not want to go to jail. She said he would not go to jail if he did not do anything, but that if he was hiding, it was because he did something. Defendant had no response. He then said he was leaving again, because he knew the police were

looking for him.  At some point, she received a communication from defendant in which he used someone else's Facebook account.  He wanted to see his children.

On June 6, M.S., a friend of defendant, told police she recently was in contact with defendant.  She had seen him on the news.  She asked him what was going on, and he said it was all a lie.  When she asked why he had changed his telephone number, he said he had lost his phone.  He asked if she wanted to go on the run with him.  She refused.

On June 11, Fresno County Sheriff's Detective McEwen, who was assigned to the fugitive apprehension team, received information concerning defendant's location.  As a result, a number of law enforcement officers and the department's helicopter went to an address in Reedley.  Defendant was taken into custody without incident.

Defendant was transported to the Fresno County Sheriff's Office, where he was turned over to Detectives Grajeda and Flores.  During their interview with him (a video recording of which was played for the jury), defendant was asked for his phone number.  He said he had had a cell phone, but had sold it to buy drugs.  He denied killing Blunt and Duarte or knowing what happened.  He said he had known Blunt a long time and described him as a friend.  He said that when he (defendant) became a drop-out, so did Blunt.

Defendant stated that the last time he talked to Blunt was the night before Mother's Day.  Defendant met Blunt and Duarte at St. Anthony's Catholic Church in Reedley.  This was about 9:30 p.m. or 10:00 p.m.  Defendant knew to meet them at the church, because Blunt called him.  Defendant was taking a lot of drugs during that time.  Defendant had walked to the church from the College Motel, which was at Manning and Reed in Reedley.  Defendant stayed there for three or four days.

Blunt and Duarte arrived at the church in an old car.  Blunt was driving.  They were the only ones in the car.  Defendant got in the backseat and commented that there were a lot of cops around.  It appeared Blunt did not want to be seen.  Defendant asked if Blunt had any drugs.  Blunt said no, and defendant said to let him know if Blunt knew

9.

anyone who wanted to buy defendant's phone. Blunt said he would buy it, and defendant said he would take $20 for it. Defendant sold Blunt the phone, then hugged Blunt and Duarte and left. This was around 10:00 p.m. Defendant left on foot to go and buy methamphetamine, which he had been using for two or three weeks. He refused to tell detectives who sold him the drugs, which he got in Reedley. He "kick[ed] back" with the person, then returned to the motel. It was around 12:30 a.m.

Defendant thought it was "kinda weird" when Blunt arrived with Duarte, because Blunt was a drop-out and Duarte was an active Northerner. Defendant dropped out in 2010, after he was shot. It was not because of who shot him; he just decided it was not worth it, and that a color was not something worth dying for. Defendant said Blunt dropped out about a year earlier, but defendant did not know why. Defendant had nothing against either Blunt or Duarte, who was also good friends with defendant.

Defendant said he checked out of the motel on Sunday. He spent Sunday at a friend's house with the friend and friend's family, then walked around, then got a ride to Los Angeles.

### *Electronic Communications Evidence*

Cell phone company records showed the T–Mobile phone found in the headliner of Blunt's vehicle was registered to defendant. Henry Cam, a criminalist with the California Department of Justice, performed forensic examinations, including user and deleted data extractions, on the T–Mobile and Nokia phones.

On May 7, two text messages were sent from defendant's phone to the phone of a contact listed in defendant's phone as "Sarah." The first read, "I want to get rid of a 357." The second, which followed a minute later, read, "300." This was followed by a multimedia message showing a photograph of a small revolver that looked to have chrome finish and a black handle.

The first telephone contact between defendant and Blunt that occurred on May 11 was a text message sent from Blunt's phone to defendant's phone at 10:50 a.m. During

10.

the day, there were multiple text messages, and several incoming and outgoing calls between defendant's and Blunt's phones. At 9:13 p.m., a text was sent from defendant's phone to the contact "M" that read, "Take me to pistol whip this n[***]a." There was an incoming text message from Blunt's phone at 11:07 p.m., then, at 11:13 p.m., an incoming text message from M.H.'s phone. Within the next approximately 10 minutes, there were several incoming and outgoing text messages to and from M.H.'s phone. At 11:21 p.m., an outgoing message to M.H.'s phone read, in part, "I have to go meey [*sic*] Joseph." At 11:22 p.m., there was an incoming telephone call of 10 seconds' duration from Blunt's phone. At 11:36 p.m., there was an incoming telephone call from Blunt's phone. It ended at 11:44 p.m. At 11:48 p.m., there was a three-second outgoing call to Blunt's phone. At 11:49 p.m., there was an incoming call from Blunt's phone. It ended at 11:53 p.m. There were four unsent messages in the outbox folder of defendant's phone, all showing the time 11:56 p.m. and addressed to different contacts, saying, "N[***]a I don't feel safe." At 12:01 a.m. on May 12, there was an outgoing text message to the phone of defendant's sister-in-law that read, "Tell her I love her."

There was no other outgoing activity on defendant's phone after that text message. Phone company records showed incoming text messages and incoming telephone calls, but the calls automatically rolled over to voicemail.

Cell phone records for the phone found on Duarte showed no telephone calls were sent or received after the evening of May 7. A text message was sent or received late on the afternoon of May 9, after which there was no text message activity until shortly after noon on May 12. After that time, all text messages were incoming and unread. Forensic extraction revealed defendant's and Blunt's phone numbers stored in the phone.

Messages and calls extracted from Blunt's cell phone matched those extracted from defendant's phone, in terms of trying to meet up on May 11. At 10:25 p.m. on that date, Blunt sent defendant a text message, saying he was at Duarte's residence. At 10:59 p.m., defendant texted Blunt that he was on the way. At 11:07 p.m., Blunt texted

11.

defendant, "Wait for us there" and "Be there in 10." There was no text message activity between the two phones on May 12.

The last four telephone calls recorded on defendant's phone prior to 12:01 a.m. on May 12, were all telephone calls either to or from Blunt's phone. The cell tower that recorded those phone calls was located in the 800 block of Reed Avenue, in Reedley. The user of defendant's phone would have to have been within two and a half miles of that address when sending or receiving those calls.

Facebook records showed defendant maintained an account until June 21. On Facebook, messages from one account to another can only be seen by the users of those accounts.

On May 31 and June 1, there was a message conversation between defendant's account and the account of Robert and Angie T. A message was sent from the latter account that read, "WTF …. You're on da news wanted for a double homicide." Later that day, a message was sent from that account, asking if defendant was okay. Defendant responded that he was good. A subsequent message from Robert and Angie T.'s account read, "A my boy did you do it. Between us delete these messages." Defendant responded, "I'll holla at you."

On June 2, messages were exchanged between defendant's Facebook account and N.M. N.M. asked what happened and what defendant was thinking. Defendant responded by telling N.M. not to believe it and that he was sorry. When N.M. advised that if it was not defendant, then defendant should not run and should take care of it, defendant responded with a sad face emoticon.

On June 6 and 7, messages were exchanged between defendant's account and S.R. On June 7, a message was sent from S.R. to defendant's account that read, "You killed my uncle huh." There was no response from defendant's account.

12.

*__Motive Evidence__*

On July 15, 2007, Reedley police located Pedro Lopez, a high-ranking Fresno County Norteño gang member and wanted felon also known as Scoobie, in the backyard of the Reedley home of Socorro Perez Romero, defendant's mother. Blunt was inside the house with Socorro at the time.

Fresno Police Department Officer Kramer, who had been assigned to the Multi–Agency Gang Enforcement Consortium (MAGEC) since March 2005, was familiar with defendant, Socorro, and Blunt, who was known as Toro. MAGEC had contacted Norteño gang members at Socorro's home on occasion. As of 2008, Blunt was a member of the gang's northern structure, also known as Nuestra Raza. He was suspected of being a member of Nuestra Familia, the prison gang that controls the northern organization, of which Norteños are the street-level members. Blunt essentially was the Norteño in charge of the activities of the Norteño gang within Fresno County from 2005 or 2006 to approximately 2010. In 2010, people within the organization began to question Blunt's status. At some point around that time, he became considered "no good," which was kind of like a forced drop-out. Such a person would be at risk of attack from, and could even be marked for death by, active gang members. Someone who was marked for death would have a "green light" on him, meaning he could be attacked without repercussions. If an active gang member came in contact with such a person, the active gang member potentially could be disciplined within the gang for not taking action. An active Norteño is not supposed to associate with a person who is "no good" or a drop-out. A good indication someone was "no good" would be if he was shot at by a member of the gang.

On September 16, 2009, defendant was the victim of a shooting. When interviewed by Fresno County Sheriff's Detective Palma, defendant identified Abel Meza, who lived in Reedley, as the perpetrator. Defendant's wife had dated Meza for a couple of years, before she started dating defendant around 2008.

13.

Defendant related that on the evening of the shooting, his mother dropped him off in Dinuba so he could visit a girl named Gabby. Defendant eventually used Gabby's phone to call Meza, because defendant needed a ride. Eventually, Meza arrived, and he and defendant drove off in Meza's pickup. Along the way, they had to stop for gas. As they continued to drive, Meza began apologizing. Defendant had been told by his mother that Meza had called defendant a bitch, and he thought this was why Meza was apologizing. Defendant previously had threatened to beat Meza up for the insult.

Defendant asked Meza to take him to defendant's mother's house in Reedley. Instead, they drove in the country outside of Reedley At some point, Meza said he was tired and asked if defendant wanted to drive. Defendant agreed, and Meza pulled over. As defendant got out and was making his way to the driver's side, he heard a sound he recognized as the racking of a handgun. He began to run, heard gunshots, and was struck in the right buttock. He made it to a house, where he was able to use a phone.

Defendant related to Palma that he had known Meza since eighth grade, and considered him a good friend up until the shooting. Defendant said he had no idea why Meza would shoot him. Defendant said Meza was a Norteño. Defendant said he himself had joined the Norteño gang when he was 15 years old, but he dropped out the day he got shot, because he got shot. Defendant agreed with Palma that if someone inside the Norteño gang was going to "take out" another Norteño member, someone higher up in the gang has to give the order. The lower ranking member has to follow the order. Defendant described his own rank in the Norteño structure as a street soldier, the lowest rank. Defendant realized his own gang wanted to kill him, and he would have been killed had he not escaped. He did not know why the gang wanted him dead.

CHP Officer Yetter, a gang investigator with MAGEC, explained that for one Norteño to shoot another, the shooter would need to get permission first from a person higher up in the organization. Yetter's investigation into defendant confirmed defendant left the Norteño gang in approximately 2009. Yetter investigated Blunt, and determined

14.

he was once in a position of leadership at least as high as the Northern structure, which was the intermediary between the Nuestra Familia prison gang and the street soldier Norteños.

Socorro's body was discovered in her home in Reedley on May 9, 2013. She had been dead for at least two weeks. Defendant and his mother were very close. He was in jail at the time her body was discovered. Although Socorro had medical problems, defendant's father and his sister were suspicious that her cause of death was not natural, based on rumors they had heard. There were concerns defendant's enemies in the gang might retaliate against his mother, whose house had been shot at previously and who had a fire set in her driveway. Reedley Police Department Officer Garza conducted some investigation, but concluded the case was not a homicide. The autopsy was not completed, due to Socorro's medical history and the decomposition of the body, although a toxicology test was performed. Alcohol and methamphetamine were found in her system. The cause of death, which was determined by her primary doctor, was listed on the death certificate as pulmonary embolism and venous thrombosis.

According to M.S., defendant's demeanor changed after his mother's death. The way he talked was angry. He told her he thought the Norteños had something to do with Socorro's death. He said he had a list of Norteños he thought were connected to her death. He talked about getting the "homies" he thought were connected to Socorro's death.

R.M. was acquainted with defendant's mother. At some point, defendant told R.M. that it just did not seem right that she had passed away and nobody knew anything. Defendant said he thought she had been given some bad drugs or might have been strangled. He thought Northerners might have had something to do with her death. Defendant said he had a list of people he "needed to get to" in association with his mother dying, and it was a list of Norteños. Defendant was "heated" about his mother's

15.

death and wanted some answers. Defendant used the word "revenge," but did not say how he was going to get it.

Defendant told R.M. that Blunt had said Blunt "never hit a PC yard." A PC, or protective custody, yard is where someone in custody goes when he or she has dropped out of a gang. It separates the drop-out from the gang for his or her own safety. Defendant said he thought Blunt was still active in the gang, but was on walk-alone status, meaning he was being investigated and monitored by the gang.

**Defense Evidence**

Records for the Motel 6 near Blackstone and Ashlan in Fresno showed defendant checked in sometime between 6:00 a.m. on May 11 and 4:59 a.m. on May 12. He checked out sometime before 2:00 p.m. on May 12.

Facebook records showed that early on June 5, defendant and S.C. messaged each other several times. When defendant said, "nothing has changed just a different war," S.C. responded that drugs had changed defendant. Defendant answered, "na mamas jus anger." When S.C. said she had anger, too, but had put all her issues aside when she had a child, defendant responded that he was the same, but his mother was his life and it took him a year to come back. When S.C. said Socorro would want so much more for defendant and his boys, defendant responded, "i know i let her down but whenyou have somethin on your shoulder it will haunt you …." (*Sic.*)

DISCUSSION

I.     **Claim of Sentencing Error**

*Procedural Background*

Because defendant's sentence included two prior prison term enhancements, this matter came before the trial court in 2023 for resentencing under section 1172.75. Prior to the resentencing hearing, the prosecutor filed a brief, which conceded the need to strike the prior prison term enhancements, but otherwise opposed any reduction in defendant's

16.

sentence. The prosecutor observed that between 2016 and 2024, defendant committed at least 14 serious rules violations while in custody, and the brief included an exhibit detailing the rules violations.

Defendant was resentenced on March 13, 2025. Defense counsel conceded that the trial court could not alter defendant's two LWOP terms. However, counsel requested the court strike the firearm enhancements under section 1385 and *Tirado*.

With the exception of striking the prior prison term enhancements, the trial court declined to give defendant a lesser sentence. The court found that striking the enhancements would endanger public safety and would not be in the furtherance of justice. (§ 1385, subd. (c).)

### *Summary of Arguments*

Defendant claims that under section 1385, the trial court erred in failing to strike the firearm enhancements at resentencing. Relying on the decision in *Gonzalez*, defendant contends the court relied on past events in assessing current risk to public safety and it failed to consider whether dismissing the enhancements would endanger *future* public safety given his LWOP terms. (*People v. Gonzalez* (2024) 103 Cal.App.5th 215, 230–231 (*Gonzalez*).) Defendant acknowledges that generally, complaints about the trial court's exercise of sentencing discretion may not be raised for the first time on appeal. He asserts, however, that "the waiver rule applies only if the court described 'the sentence it *intends* to impose *and the reasons* for the sentence, and the court thereafter considers the objections of the parties *before the actual sentencing*.'" (Quoting *People v. Gonzalez* (2003) 31 Cal.4th 745, 752.) Defendant argues that we should not apply the forfeiture doctrine because the trial court did not provide a tentative ruling, did not articulate its reasons for finding defendant a danger to the community, and did not make any findings until after the parties made their arguments and submitted the matter.

Although the People dispute the trial court committed prejudicial error under section 1385, they do not address forfeiture and instead primarily argue that because

17.

defendant was sentenced to LWOP, the trial court lacked jurisdiction to resentence him under section 1172.75.

For the reasons that follow, we reject both the People's jurisdiction argument and defendant's argument that forfeiture should not apply. Given defendant's failure to object or otherwise raise the issue in the trial court, his claim of sentencing error under section 1385 is forfeited.

### *Jurisdiction*

Section 1172.75 provides, "Any sentence enhancement that was imposed prior to January 1, 2020, pursuant to subdivision (b) of Section 667.5, except for any enhancement imposed for a prior conviction for a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code is legally invalid." (*Id.*, subd. (a).) Subdivision (f) of the statute provides, "Commencing on January 1, 2025, an individual who has been convicted of a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code and sentenced to death or a life term without the possibility of parole, who, as of January 1, 2025, has not had their judgment reviewed and verified by the sentencing court as provided in subdivision (c), is not eligible for recall and resentencing under this section. This subdivision does not apply retroactively." (*Id.*, subd. (f) [added by Sen. Bill No. 285 (2023–2024 Reg. Sess.), eff. Jan. 1, 2025].)

In *Robinson*, this court addressed the same argument the People advance here. After interpreting section 1172.75, the court held, "[S]ubdivision (f) of section 1172.75 must be construed conjunctively to exclude from resentencing only those individuals who have been convicted of a qualifying sexually violent offense *and* sentenced to death or a life term without the possibility of parole." (*Robinson, supra*, 120 Cal.App.5th at p. 529 [2026 Cal.App. Lexis 288, *19–20].) There is no dispute that although defendant was sentenced to LWOP in this case, he did not commit a qualifying sexually violent offense. Therefore, the trial court had jurisdiction under section 1172.75. (*Ibid.*)

18.

*Section 1385*

Section 1385 permits the trial court to dismiss an enhancement in furtherance of justice. (*Id.*, subd. (a).) As amended by Senate Bill No. 81 (2021–2022 Reg. Sess.), effective January 1, 2022, section 1385, subdivision (c)(1), provides, "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute," and "[i]n exercising its discretion under this subdivision, the court *shall* consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, *unless* the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others" (*id.*, (subd. (c)(2), italics added).

In *Gonzalez*, which was decided approximately nine months before the resentencing hearing in this case, the defendant claimed several mitigating circumstances applied, and the Court of Appeal found "the trial court erred because it considered only whether [the defendant] *currently* posed a danger to the public when assessing if a dismissal of the firearm enhancement would 'endanger public safety.'" (*Gonzalez, supra*, 103 Cal.App.5th at p. 230, quoting § 1385, subd. (c)(2).) The court explained, "Although the current dangerousness of the defendant is an appropriate factor to consider, as it will have some bearing on whether dismissing the enhancement would endanger the public, a crucial part of the inquiry is how the dismissal of the enhancement will impact the length of the defendant's sentence. A currently dangerous defendant who will be released from prison within a short timeframe might be found by the trial court to pose a greater danger to the public than a defendant who is currently dangerous but who has no prospect of release from prison until he is elderly." (*Gonzalez, supra*, at p. 228.)

19.

In this case, defendant points to one enumerated mitigating circumstance under section 1385, subdivision (c)(2) that applies: "Multiple enhancements are alleged in a single case." (*Id.*, subd. (c)(2)(B).) Citing California Rules of Court, rule 4.423(b)(6), he also points out he was 25 years old at the time of the crime, and counsel argued in the trial court that defendant's mental health issues and the death of his mother were mitigating factors. (See § 1016.7, subd. (b) [defining "'youth'" as under the age of 26 years when offense committed].)[7] Defendant argues that, as in *Gonzalez*, the trial court denied his request for relief under section 1385 without assessing the future danger to public safety should the two 25-year-to-life firearm enhancements be stricken. (*Gonzalez, supra*, 103 Cal.App.5th at p. 231.) However, in the trial court, defendant did not develop an argument that he presented no future danger to public safety should the enhancement be stricken, he did not object to the sentence pronounced, and he did not ask the trial court to make a more specific record. In short, defendant failed to alert the trial court to the claim of error he now advances on appeal.

### *Forfeiture Doctrine*

"'A party in a criminal case may not, on appeal, raise "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" if the party did not object to the sentence at trial. [Citation.] The rule applies to "cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons …."'" (*People v. Scott* (2015) 61 Cal.4th 363, 406.) "Strong policy reasons support this rule: 'It is both unfair and inefficient to permit a claim of error on

---

[7] Commission of the offense as a juvenile is an enumerated mitigating factor under section 1385, subdivision (c)(2)(G), but the statute also provides, "The circumstances listed in paragraph (2) are not exclusive and the court maintains authority to dismiss or strike an enhancement in accordance with subdivision (a)." (*Id.*, subd. (c)(4).)

appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided. [Citations.]' [Citation.] "'"'"The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal."'"'" (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114 (*Stowell*); accord, *People v. Salazar* (2016) 63 Cal.4th 214, 239–240; *People v. French* (2008) 43 Cal.4th 36, 46.)

"'[D]iscretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue.'" (*In re Sheena K.* (2007) 40 Cal.4th 875, 887–888, fn. 7.) Absent a substantive change in the law that applies retroactively (e.g., *People v. Salazar* (2023) 15 Cal.5th 416, 431–432; *People v. Stamps* (2020) 9 Cal.5th 685, 698–699), or an extenuating circumstance such as the futility of objecting under the then-governing substantive law (e.g., *People v. Perez* (2020) 9 Cal.5th 1, 7–8; *People v. Brooks* (2017) 3 Cal.5th 1, 92), neither of which is at issue here, the policy reasons underlying the forfeiture doctrine fully support its application where a defendant remains silent in the trial court when sentenced and then seeks to obtain appellate relief based on an asserted sentencing error that could have been raised at the time of sentencing.

Defendant does not claim that he objected or made the argument he now seeks to pursue on appeal, but he contends the trial court failed to provide a tentative ruling, failed to articulate its reasoning in finding he posed a danger to the community, and made its ruling after the parties argued and submitted the matter. In support of his argument that the forfeiture doctrine should not be applied, defendant relies on *People v. Gonzalez, supra*, 31 Cal.4th at page 752. In that case, the California Supreme Court stated, "[T]he

*Scott*[8] rule applies when the trial court 'clearly apprise[s]' the parties 'of the sentence the court intends to impose and the reasons that support any discretionary choices' (*Scott, supra*, 9 Cal.4th at p. 356), and gives the parties a chance to seek 'clarification or change' (*id.* at p. 351) by objecting to errors in the sentence." (*Ibid.*) However, as the court explained, "It is only if the trial court *fails* to give the parties any meaningful opportunity to object that the *Scott* rule becomes inapplicable." (*Ibid.*, italics added.) That did not occur here. The trial court permitted the parties a full and fair opportunity to be heard, and the record is devoid of any indication the court was intemperate or would not have permitted an objection after it ruled.[9]

A general request for relief under section 1385 does not serve to preserve defendant's present claim that the court abused its sentencing discretion as to a finding on public safety because it failed to assess future dangerousness, necessitating remand for resentencing. Had defendant objected to his sentence on the ground he raises on appeal, the very error he now asserts entitles him to remand could have been corrected or the record otherwise developed as to the issue.

"[A] party cannot argue on appeal that the trial court erred in failing to conduct an analysis it was not asked to conduct" (*Fruits, supra*, 247 Cal.App.4th at p. 208, fn. omitted; accord, *People v. Fuivava* (2012) 53 Cal.4th 622, 655), and strong policy reasons support application of the rule in the situation presented in this case (*Stowell, supra*, 31 Cal.4th at p. 1114). In this instance, the relevant amendment to section 1385

---

**8**     *People v. Scott* (1994) 9 Cal.4th 331, 357 (*Scott*) ("complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal").

**9**     In fact, the record reflects that after the sentence was pronounced, the parties discussed an issue off the record. The trial court thereafter went back on the record to take up that issue, which was whether defendant should be transferred directly back to the institution he came from or to a reception center. This event belies any intimation that defendant could not have objected after the sentence was pronounced or otherwise sought clarification. (*People v. Gonzalez, supra*, 31 Cal.4th at p. 752.)

had been in effect for more than three years, the decision in *Gonzalez* was issued approximately nine months before the resentencing hearing, and there is no indication the trial court misunderstood the scope of its sentencing discretion. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042 ["[a]bsent evidence to the contrary, we presume that the trial court knew the law and followed it"].) Defendant neither made the argument nor objected on the ground now advanced on appeal as supporting remand for resentencing. Had he done so, the trial court could have addressed the issue. Accordingly, we find defendant forfeited review of his claim that the court erred by failing to include an assessment of future danger to public safety.[10]

## II. The Abstract of Judgment and the Minute Order Must Be Amended to Conform to the Judgment

Defendant also claims the trial court erred in imposing a $300 parole revocation restitution fine under section 1202.45. The People agree the fine would be unauthorized, but point out the error is confined to the minute order and abstract of judgment.

---

[10] Defendant does not argue that if we find he forfeited his claim, defense counsel rendered ineffective assistance of counsel. (Cal Rules of Court, rule 8.204(a)(1)(B) [each point must be separately stated, supported by argument, and, if possible, by authority]; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363 ["[i]f a party's briefs do not provide legal argument and citation to authority on each point raised, '"the court may treat it as waived, and pass it without consideration"'"].) We nevertheless observe that "'[d]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.'" (*People v. Carrasco* (2014) 59 Cal.4th 924, 985, quoting *People v. Hillhouse* (2002) 27 Cal.4th 469, 502.) Moreover, "[c]ounsel is not ineffective for failing to make frivolous or futile motions" (*People v. Thompson* (2010) 49 Cal.4th 79, 122; accord, *People v. Bell* (2019) 7 Cal.5th 70, 126–127), and counsel may, in the exercise of his or her professional judgment, determine that an objection would not result in a more favorable determination for his or her client (*Strickland v. Washington* (1984) 466 U.S. 668, 690; accord, *People v. Barrett* (2012) 54 Cal.4th 1081, 1105). Under the circumstances in this case, defense counsel could have reasonably determined that seeking a more detailed ruling on the issue of public safety or objecting on the ground now raised on appeal would not have benefitted defendant, which forecloses any claim of ineffective assistance of counsel. "[I]f the court does not conclude that dismissal would endanger public safety, then mitigating circumstances strongly favor dismissing the enhancement. *But ultimately, the court must determine whether dismissal is in furtherance of justice.*" (*People v. Walker* (2024) 16 Cal.5th 1024, 1036, italics added; see *Harrington v. Richter* (2011) 562 U.S. 86, 112 ["[t]he likelihood of a different result must be substantial, not just conceivable"].)

At the resentencing hearing, the trial court imposed a $300 restitution fine under section 1202.4, but because defendant is serving terms of LWOP, the court did not impose a parole revocation restitution fine under section 1202.45. The minute order and abstract of judgment, however, reflect a parole revocation restitution fine was imposed and suspended.

Where there is a discrepancy between the oral pronouncement of judgment and the abstract of judgment, the oral pronouncement controls (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385), and we may correct a clerical error in recording the judgment at any time (*People v. Mitchell* (2001) 26 Cal.4th 181, 185). Consequently, we will direct the trial court to correct the minute order and abstract of judgment to omit reference to imposition of a parole revocation restitution fine under section 1202.45.

## DISPOSITION

The judgment is affirmed, but the trial court is directed to correct the abstract of judgment and sentencing minute order to conform to the oral pronouncement of judgment by omitting reference to imposition of a parole revocation restitution fine under section 1202.45. The trial court shall forward the amended abstract of judgment to the appropriate authorities.

MEEHAN, J.

WE CONCUR:

DETJEN, Acting P. J.

SNAUFFER, J.

24.